UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **AMERICAN BANK AND TRUST CO.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 06-CV-0317-CVE-FMH |
| ) | |
| **BOND INTERNATIONAL LIMITED,** ) | |
| **BOND INTERNATIONAL (US) INC.,** ) | |
| **BOND INTERNATIONAL (U.K.) LIMTED,** ) | |
| **DAVID K. BOND and AKKEL** ) | |
| **HOLDINGS LIMITED,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**OPINION AND ORDER**

Now before the Court is Defendants' Objection to Plaintiff's Motion to Appoint Receiver (Dkt. # 29). In their objection, defendants claim the Trading with the Enemy Act of 1917, 50 U.S.C. § 1, et seq. ("TWEA"), and the Cuban Assets Control Regulations, 31 C.F.R. § 515.101, et seq. ("CACR"), invalidate the security agreements held by American Bank and Trust Company ("American") in collateral owned by defendants.[1]  According to defendants, plaintiff is not likely to succeed in its request for the appointment of a receiver because the security agreement held by American is void under the TWEA and the CACR.  However, neither party has complied with the licensing requirements of either the TWEA or the CACR.  While this does not deprive the Court of subject matter jurisdiction, it does prevent the Court from entering an order that would potentially interfere with the status of items leased to a Cuban corporation.  The Court will appoint a receiver,

---

[1]  Defendants' objection raises other issues about the propriety of appointing a receiver which will be dealt with in the Court's findings of fact and conclusions of law.

but will exclude the receiver from exercising any power over the leases or proceeds from the leases of Havana Club International, S.A. ("Havana Club").

**I.**

Bond International Limited ("Bond BVI"), through its subsidiaries Bond International Inc. ("Bond US") and Bond International Limited ("Bond UK"), leases intermodal tanks, containers and chassis used for transportation and shipping.[2] David K. Bond ("Bond") is the president and chief executive officer of Bond BVI.[3] Bond established a bank account and credit line with American in 1995 and the parties entered several loan agreements from 1995 to 1999. On March 23, 1999, American loaned Bond BVI and its subsidiaries $25 million.[4] The credit agreement shows that Bond BVI, Bond US, and Bond UK accepted a loan of $25 million and promised to repay the loan by April 5, 2002. The borrowers executed a credit agreement granting American a security interest in certain leases, containers and chassis owned by Bond BVI and its subsidiaries.[5]

As part of the agreement, Bond agreed that proceeds from the identified leases would be deposited in a bank account at American, which the parties refer to as the "lockbox." This ensured that American could access funds for repayment of the loan and keep track of the overall condition of Bond BVI, Bond US, and Bond UK. However, the agreement provided that proceeds from tank

---

[2] Bond BVI is a wholly owned subsidiary of Akkel Holding Limited.

[3] Bond is also the president of Bond US, and the chairman and managing director of Bond UK.

[4] Bond BVI, Bond US and Bond UK are collectively referred to as the "borrowers" in the credit agreement. In addition, Bond simultaneously executed a personal guaranty as part of the collateral for the loan.

[5] At this stage, defendants have not disputed that American properly perfected its security interests in the leases and proceeds from the leases.

leases to the Havana Club were not to be deposited in the lockbox.  Havana Club is owned in part by the Cuban government and transactions with Havana Club are subject to the CACR.  Havana Club leases approximately 40 tanks in order to export rum from Cuba.[6]  The parties do not dispute that the collateral is not illegal under the CACR or that defendants have the right to trade with a Cuban corporation.  Defendants and American structured the loan agreement in order to avoid the regulatory requirements of the CACR and there is no evidence that any party had a license under the CACR to bring proceeds from the Cuban leases into the United States.

Defendants defaulted on the loan and the parties subsequently modified the note and credit agreement.  By January 3, 2006, Defendants still owed $22,125,111 of the principal on the note.  American modified the note to give defendants until April 4, 2006, to pay the remaining principal and interest on the note.  As of August 2, 2006, the outstanding balance on the note was $23,292,211.  American filed this lawsuit to collect the outstanding principal and interest on the loan, and as part of its claim for relief, American has asked the Court to appoint a receiver to safeguard its collateral and manage defendants' business.  American has discovered that defendants were diverting payments from the lockbox and depositing payments in a bank account in the United Kingdom instead of the lockbox. Under the loan agreement, only Havana Club's payments were supposed to be diverted from the lockbox in order to avoid the regulatory restrictions imposed by the CACR.  American has significant concerns about defendants' cash flow and ability to maintain their status as going concerns.  Defendants object to the appointment of a receiver on the ground that the TWEA and the CACR require the Court to invalidate the entire loan agreement because part of

---

[6] Defendants own approximately 1300 tanks, 250 chassis, and 20 dry containers.  Of these, about 750 of the tanks, 30 of the chassis, and all 20 dry containers are leased to customers.

3

the loan agreement gave American a security interest in leases, proceeds, and tanks held by a Cuban corporation.

**II.**

Defendants claim that the TWEA and the CACR do not allow American to maintain a security interest in leases and collateral to the Havana Club, because the Havana Club is partially owned by the Cuban government. Defendants argue that Cuba is an officially recognized enemy of the United States and American businesses may not have an interest in any property held by the Cuban government without a license from the Treasury Department. The TWEA prohibits business dealings with an enemy[7] unless the President issues a license authorizing the transaction. 50 U.S.C. App. § 3. The President is authorized to appoint an Alien Property Custodian to enforce the TWEA and confiscate "all money and property in the United States due or belonging to an enemy, or ally of enemy." 50 U.S.C. App. § 6; Ecker v. Atlantic Refining Co., 222 F.2d 618, 621-22 (4th Cir. 1955). The TWEA provides federal district courts with subject matter jurisdiction to hold summary forfeiture proceedings for actions brought by the Alien Property Custodian[8] and for the United States Claims Court to hear claims against the United States to recover the proceeds from the sale of any property under the TWEA. 50 U.S.C. App. §§ 17, 42; Central Union Trust Co. of New York v. Garvan, 254 U.S. 554, 566 (1921); Bonnar v. United States, 438 F.2d 540, 547 (Ct. Cl. 1971).

---

[7]   The TWEA defines "enemy" as any individual, entity, or government of any nation that is currently at war with the United States. 50 U.S.C. App. § 2.

[8]   Claimants may file an administrative action with the Alien Property Custodian to recover property that has been seized by the United States government. However, this process is discretionary and is not subject to judicial review. Schilling v. Rogers, 363 U.S. 666 (1960); Von Clemm v. Banuelos, 498 F.2d 163 (1st Cir. 1974).

The CACR continued the Cuban embargo first authorized by the President in 1963 and allowed the executive branch to restrict trade and travel to Cuba in times of war and peace. Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1436 (9th Cir. 1996); Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 256 (S.D.N.Y. 2002). The regulations prohibit products originating in Cuba from being imported into the United States and discourage businesses from directing American currency to Cuba which could be used to support the Cuban government. Havana Holding Club S.A. v. Galleon S.A., 203 F.3d 116, 117-118 (2d Cir. 2000). Enforcement of the CACR has been delegated to the Treasury Department and the Office of Foreign Asset Control ("OFAC"). The CACR[9] prohibits

> (1) All dealing in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and
>
> (2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

31 C.F.R. § 515.201. The regulations further provide that "[a]ny transfer after the 'effective date' which is in violation of any provision of this part . . . is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property." 31 C.F.R. § 515.203(a); Miranda v. Secretary of Treasury, 766 F.2d 1, 4 (1st Cir. 1985). In order to conduct business in Cuba, a party may obtain a license from OFAC for particular

---

[9] The CACR specifically enforce the TWEA and any license to do business with Cuba under the CACR also authorizes the licensee to conduct business under 50 U.S.C. App. 5(b). Real v. Simon, 510 F.2d 557, 559-60 (5th Cir. 1975) (holding that the CACR are authorized under the TWEA but finding the government's interpretation that a dead person was a "foreign national" exceeded the agency's authority); Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 115-116 (2d Cir. 1966) (CACR constituted a valid exercise of administrative authority under 50 U.S.C. App. § 5(b)).

transactions to "validate the transfer or render it enforceable to the same extent as it would be valid or enforceable but for the provisions of section 5(b) of the Trading With the Enemy Act." 31 C.F.R. § 515.203(c); Empresa Cubana Del Tabaco v. Culbro Corp., 399 F.3d 462, 473 (2d Cir. 2005).

Neither the TWEA nor the CACR are not clear about who may seek judicial review or what court, if any, has jurisdiction over claims under these regulations. Neither the TWEA or the CACR provide litigants with a private cause of action to challenge the Cuban government's confiscation of their real property in Cuba. Glen v. Club Mediterranee S.A., 365 F. Supp. 2d 1263 (S.D. Fla. 2005). It is clear that the United States may bring a prosecution for alleged violations of TWEA and CACR. United States v. Plummer, 221 F.3d 1298 (11th Cir. 2000); United States v. Brodie, 174 F. Supp. 2d 294 (E.D. Pa. 2001). Cuban nationals who failed to obtain a license prior to filing an in personam crossclaim for monetary damages could proceed in federal court, as long as the judgment did not require the district court to dispose of property in violation of the CACR. Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 361-63 (11th Cir. 1984). However, the issue in this case is not whether defendant has standing to bring a claim under the CACR, but whether the Court has the authority to enter an order authorizing a receiver to take control of property leased to a Cuban corporation that is partially owned by the Cuban government

### III.

The Court finds that the CACR limits the Court's power to grant plaintiff relief against collateral held by a Cuban corporation and plaintiff's security interests in property leased by the Havana Club may not be enforced in this Court. There is no evidence that any party has a license from OFAC to conduct business in Cuba, and this precludes the Court from entering an order authorizing a receiver to take control of property held by a Cuban entity. At the evidentiary hearing,

6

the credit officer for American, Gregory W. Rusco, testified that the parties excluded the Havana Club funds from the lockbox because of federal regulations that would have imposed restrictions on the receipt of funds from the Havana Club. Plaintiff or defendants could have obtained a license from OFAC to lease tanks to the Havana Club or maintain security interests in those tanks, which would have allowed this Court to enter an order or judgment disposing of that property. However, the parties chose to structure their agreement to avoid the CACR by sending funds from the Havana Club to a bank account in the United Kingdom. The CACR are structured so that parties that seek to avoid their regulatory requirements can not later attempt to enforce property rights in federal court that would fall under OFAC's jurisdiction.

In Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, the Eleventh Circuit held that Cuban nationals could litigate an in personam crossclaim for damages in district court without first seeking a license to bring the crossclaim, but could not seek relief that would alter the underlying property rights of the parties. In that case, Dean Witter Reynolds, Inc. ("Dean Witter") sued Banco Nacional de Cuba and CUBAEXPORT[10] in federal court alleging that the defendants had made conflicting claims to certain funds and securities. The Cuban parties filed a crossclaim against Dean Witter alleging that several parties committed fraud by stealing the proceeds of a letter of credit. Out of an abundance of caution, the Cuban parties requested a license to pursue the crossclaim and receive a judgement after the litigation had begun. The request was granted and they received a license from the Treasury Department. The Eleventh Circuit held that the CACR "forbid only those judicial acts that transfer a property interest." Id. at 361-62. The Cuban parties could proceed with

---

[10]  Both the Banco Nacional de Cuba and CUBAEXPORT were wholly owned by Cuban government.

an in personam claim for monetary damages without obtaining a license before filing the crossclaim. Id. at 362. The court was careful not to characterize the licensing regulations as a jurisdictional requirement, but as a limit on the power of federal courts to grant relief that would interfere the executive branch's control over certain property transactions in foreign countries. Id. at 360 n.16.

Other courts that have considered the licensing requirements under the CARC and similar acts have found that failure to obtain a license does not deprive the court of subject matter jurisdiction. Comet Enterprise Ltd. v. Air-A-Plane Corp., 128 F.3d 855, 860 (4th Cir. 1997) ("OFAC, the agency charged with enforcing the regulation containing the licensing requirement, does not assert that the requirement deprives the federal courts of jurisdiction"); National Oil Corp. v. Libyan Sun Oil Co., 733 F. Supp. 800, 809 (D. Del 1990) (existing case law supported "the proposition that foreign blocking regulations bar only those judicial proceedings that effect a transfer of foreign property or interest"); National Airmotive Corp. v. Government & State of Iran, 499 F. Supp. 401, 405 (D.D.C 1980) ("Thus, prior constructions of regulations identical to those at issue in the present case not only have established that the regulations do not require litigation concerning frozen assets to be stayed; they go so far as to suggest that judgment may be entered, at least as long as a transfer of blocked assets is not entailed."). However, the law is clear that the Court may not enter an order concerning rights in property when a Cuban entity also has an interest in the property, if the claimant has not sought a license from the Treasury Department, because those transactions are within the regulatory authority of OFAC only. See Lary v. Republic of Cuba, 643 F. Supp. 194, 187 (S.D.N.Y. 1986) ("the courts of this circuit have not hesitated to give full force and effect to the CACR requirement that persons who wish to engage in transactions prohibited by the regulations apply to the OFCA [sic] for a license to do so."); Richardson v. Simon, 420 F. Supp. 916 (E.D.N.Y.

1976) ("this Court will not order the transfer of property in which a Cuban interest exists where, as in the instant case, there is no Treasury license authorizing such a transfer."). The Court does not find that the CACR deprive it of jurisdiction to review plaintiff's security interests in property leased by the Havana Club, but the Court has no authority to issue a transfer of (including appointment of a receiver for) property rights in Havana Club's tanks or the proceeds of leases without evidence that plaintiff has obtained a license from OFAC to maintain such security interests.

The Court finds that it may not enforce American's security interests in tanks leased by the Havana Club, the proceeds of the leases, or any other interest American may claim. This does not invalidate the provisions of the loan documents related to this security agreement. It is simply beyond the power of the Court to enforce the agreement in a way that would infringe on the power of OFAC to regulate trade with a foreign nation. Therefore, the Court will appoint a receiver but the Court may not grant the receiver powers to use, dispose of, collect payment, or hold any other power associated with the collateral leased to the Havana Club or the proceeds of such leases unless plaintiff obtains a license from OFAC quoting the necessary authority to conduct business with Havana Club.

**IV.**

Defendant has argued that if the Court finds that American may not maintain its security interest in the tanks leased to Havana Club, the entire agreement must be invalidated. Neither the TWEA and CACR mention the issue of severability, and defendants do not offer any case law to support their argument that the Court must invalidate the entire agreement if any part violates federal trade regulations. Even if the Court were to invalidate provisions of the loan documents insofar as

they related to the Havana Club leases, there is no legal basis to invalidate American's security interests in their entirety.

The credit agreement discusses severability and provides that if any provision of any loan document is found invalid, that provision shall be severable. Section 8.5 of the credit agreement states:

> 8.5 **Invalid Provision**. If any provision in any Loan Document is held to be illegal, invalid, or unenforceable, such provision shall be fully severable; the appropriate Loan Document shall be construed and enforced as if such provision had never comprised a part thereof; and the remaining provisions thereof shall remain in full force and effect and shall not be affected by an such provision or by its severance therefrom. AMERICAN, and each BORROWER party to such Loan Document agree to negotiate, in good faith, the terms of a replacement provision as similar to the severed provision as may be possible and be legal, valid, and enforceable.

Dkt. # 1, Ex. A, at 26. This is clear evidence that the parties intended to sever unenforceable provisions without preventing either party from enforcing the loan agreement. Although defendants claim that the Court must deny plaintiff's request to appoint a receiver because of a potential regulatory problem with leases to the Havana Club, this would clearly violate the intent of the parties when they entered this transaction. The Court will not take the drastic step of invalidating the entire agreement, when the parties considered this issue before entering the contract and agreed to sever unenforceable provisions.

**IT IS THEREFORE ORDERED** that defendant's Objection to Plaintiff's Motion to Appoint a Receiver (Dkt. # 29) is **granted in part** and **denied in part**: the Court will not invalidate the loan agreement and accompanying documents in their entirety; however, the Court will not allow plaintiff to proceed against any collateral involving Havana Club International, S.A., including tanks, leases, and proceeds from leases.

**IT IS FURTHER ORDERED** that if plaintiff notifies the Court that it is in compliance with the Cuban Assets Control Regulations, the Court may amend this Order and grant the receiver appropriate powers to manage assets leased to Havana Club International, S.A.

**DATED** this 4th day of August, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT