**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **AMERICAN BANK AND TRUST CO.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 06-CV-0317-CVE-FMH |
| ) | |
| **BOND INTERNATIONAL LIMITED,** ) | |
| **BOND INTERNATIONAL (US) INC.,** ) | |
| **BOND INTERNATIONAL (U.K.) LIMITED,** ) | |
| **DAVID K. BOND and AKKEL** ) | |
| **HOLDINGS LIMITED,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AS TO APPOINTMENT OF RECEIVER**

Now before the Court is Plaintiff American Bank & Trust Co.'s Motion for the Appointment of a Receiver (Dkt. # 8). On August 2, 2006, the Court held an evidentiary hearing on plaintiff's motion. Considering the briefs filed by the parties and the evidence presented at the hearing, the Court finds that plaintiff's motion should be granted. The Order Appointing Receiver is filed herewith.

**FINDINGS OF FACT**

**The Parties**

1. American Bank and Trust Co. ("American") is a banking corporation organized and existing under the laws of Oklahoma, with its principal place of business located in Tulsa, Oklahoma.

2. Defendant Bond International Limited ("Bond BVI") is an international business company organized and existing under the laws of the British Virgin Islands, with its principal place of business located in London, United Kingdom.

3.      Defendant Bond International (US) Inc. ("Bond US") is a corporation organized and existing under the laws of Delaware, with its principal place of business located in London. Bond US is a wholly owned subsidiary of Bond BVI.

4.      Defendant Bond International (U.K.) Limited ("Bond UK") is a corporation organized and existing under the laws of England & Wales, United Kingdom, with its principal place of business located in London. Bond UK is a partially owned subsidiary of Bond US, and is partially owned by David K. Bond and Ina Bond.

5.      Defendant David K. Bond ("Bond") is an individual and a resident of the United Kingdom. Bond is the President and Chief Executive Officer of Bond BVI, the President of Bond US, and the Chairman and Managing Director of Bond UK. Bond is a director of all defendant corporations and is also an indirect beneficial shareholder of Bond BVI, Bond US, and Bond UK and a shareholder of Bond UK.

6.      Akkel Holdings Limited ("Akkel") is an international business company organized and existing under the laws of the British Virgin Islands, with its principal place of business located in the British Virgin Islands. Bond BVI is a wholly owned subsidiary of Akkel.

7.      Defendants are in the business of leasing intermodal containers, chassis, and bulk containers for transportation and shipping purposes.

**Defendants' Contacts with this Forum**

8.      Defendants began transacting business with American as early as 1992. Bond has maintained bank accounts with American since at least 1992, and Bond and Bond BVI entered into at least fourteen different loan agreements with American between 1995 and 1999.

9.  In addition to the loan which is at issue in this case, defendants have two other current loans outstanding with American that are in default. Defendants also have additional agreements with American for the management of leases on certain containers owned by American.

10. Negotiations, execution, and closing of the loan documents took place between defendants, represented by their chief executive officer Bond, and representatives of American, in Tulsa. At the time of closing, defendants maintained an office in Texas, and currently maintain an office in Houston, Texas.

11. Bond, as an officer of the defendants, held personal meetings with representatives of American in Tulsa to discuss the loans with American, including the loan that is at issue. In connection with this loan, defendants regularly submitted financial reports and documentation to American. Defendants made payments on their loans to American, and directed customers to make lease payments to defendants' lock box with American.[1]

12. Some of the intermodal shipping containers owned and operated by the defendants and subject to American's security interests have been located in, and purchased from a manufacturer in, Sand Springs, Oklahoma.

13. Pursuant to the Credit Agreement, § 9.6, the Bond Guaranty, § 5.9, and the Akkel Guaranty, § 5.9, the defendants have each irrevocably consented and submitted to the jurisdiction of the federal

---

[1] The lockbox is a bank account defendants established at American in connection with the loan agreement. Defendants deposited proceeds from leases identified in the loan documents into this bank account in order that American could access funds for repayment of the loan and keep track of the condition of defendants' business. The only lease proceeds specifically excluded from the lockbox were payments made by the Havana Club International, S.A. ("Havana Club"), because of federal regulations that prohibit business dealings with entities owned by the Cuban government.

court in the Northern District of Oklahoma, agreed that this court would have exclusive jurisdiction over this matter, and further agreed that this action could be maintained in this court.

**The Loan**

14.     On or about March 23, 1999, American and Bond BVI, Bond UK, and Bond US ("Borrowers") executed a credit agreement establishing the terms of a loan from American to Borrowers in an amount never to exceed $25 million in principal ("the Loan").  On the same date, Borrowers executed a promissory note in favor of American ("March 23, 1999 Note") that provided for a principal amount never to exceed $25 million plus interest.

15.     In connection with the Loan, American and Borrowers entered into a security agreement on March 23, 1999, in which Borrowers granted American a security interest in certain described collateral, including Borrowers' then or after acquired leases, shipping containers, chassis, and other items.

16.     On or about March 23, 1999, American and Bond UK entered into a guarantee and debenture whereby Bond UK guaranteed the indebtedness created by the parties' Loan and granted American a security interest in certain described collateral and other present and future rights and interests owned by Bond UK.

17.     On or about March 23, 1999, Bond US executed a deed of charge ("Bond US Deed of Charge") granting American security interests in certain described shares of Bond UK.

18.     On or about March 23, 1999, Bond and Ina Bond executed a deed of charge ("David and Ina Bond Deed of Charge") granting American a security interest in certain described shares of Bond UK.

19.     On or about March 23, 1999, Akkel executed a share pledge agreement whereby Akkel granted American a security interest in certain described shares of Bond BVI. The share pledge agreement was amended on or about January 30, 2003.

20.     American is the current holder of the credit agreement, security agreement, guarantee and debenture, Bond US Deed of Charge, David and Ina Bond Deed of Charge, and the share pledge agreement ("Loan Documents") as amended.

21.     The collateral owned by Borrowers and secured to American by the Loan Documents is specifically described in the Security Agreement, § 4, Guarantee and Debenture, § 4, Bond US Deed of Charge, § 2, David and Ina Bond Deed of Charge, § 3, and the Share Pledge Agreement, § 1. The collateral generally includes, but is not limited to: intermodal tanks; containers; chassis; present and future contract rights; leases; lease proceeds; names and trademarks; stock interests; general intangibles; office furniture and equipment; computers; software; data; business records; telephone and email numbers, addresses, and listings; and original files, including certificates of origin and original certifications pertaining to the containers and chassis.

22.     Subsequent to the execution of the Loan Documents, American took steps to perfect its security interests in the collateral. Defendants have not disputed that American has properly perfected its security interests in the collateral and the proceeds from the collateral. American filed UCC financing statements for the collateral owned by Bond BVI and Bond UK with the District of Columbia Recorder of Deeds. American filed UCC financing statements for the collateral owned by Bond US with the Delaware Department of State, UCC Filing Section. American took possession of the original stock certificates of Bond BVI, Bond UK, and Bond US. American also took possession of the certificates of title for the various chassis owned by Bond BVI, Bond UK, and

Bond US. American maintains control of the Bond BVI deposit accounts maintained at American. American filed the Security Agreement in the Register of Mortgages, Charges and other Encumbrances of Bond BVI with the British Virgin Islands, Companies Registry. American filed the Share Pledge Agreement in the Register of Mortgages, Charges and other Encumbrances of Akkel with the British Virgin Islands, Companies Registry. American filed the Guarantee and Debenture in the Company Record for Bond UK with Companies House, Cardiff, United Kingdom.

23.     The credit agreement has been amended from time to time, culminating in the Sixteenth Amendment to Credit Agreement dated January 3, 2006 ("Sixteenth Amendment"), and likewise, the March 23, 1999 Note has been replaced with successive notes in connection with each amendment to the credit agreement, culminating in a promissory note dated January 3, 2006, given in connection with the Sixteenth Amendment ("January 3, 2006 Note").

24.     Pursuant to Section 7 of the Eleventh Amendment to the Credit Agreement and Section 8 of each successive amendment to the credit agreement, Borrowers agreed to release American "from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages, and expenses of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any manner or things done, omitted, or suffered to be done by [American] prior to and including the date of execution hereof, and in any way directly or indirectly arising out of or in any way connected to . . . the Loan Documents heretofore executed, including but not limited to, claims relating to any settlement negotiations."

**Default by the Defendants**

25. Pursuant to the Sixteenth Amendment and the January 3, 2006 Note, Borrowers were required to make payment of all principal, interest, and other amounts due on the Loan by April 4, 2006. Borrowers have failed to make payment as required by the credit agreement and are in default under the Loan Documents. The Defendants do not dispute that the Loan is in default.

26. As of August 2, 2006, the outstanding balance remaining due on the Loan was $23,292,211, with default interest continuing to accrue at the floating rate established in the credit agreement.

27. The Bond Guaranty and the Akkel Guaranty provide that when a default occurs under the Loan Documents, Bond and Akkel are obligated to satisfy any and all obligations owing to American by Borrowers under the Loan Documents. Demand and presentment for payment were waived by Bond and Akkel in § 1.5(b) of the Bond Guaranty and in § 1.5(b) of the Akkel Guaranty. Although all conditions precedent to Bond and Akkel's performance under the guaranties have been performed, Bond and Akkel have failed to satisfy their obligations under the guaranties.

28. American filed its complaint (Dkt. # 2) against the defendants on June 19, 2006, seeking judgment on the amounts due on the Loan, foreclosure of its security interests, appointment of a receiver for the collateral, and injunctive relief.

29. American filed a motion requesting the Court to appoint a receiver (Dkt. # 8).

30. Pursuant to Section 9.6(a) of the Credit Agreement, Section 5.9 of the Bond Guaranty, and Section 5.9 of the Akkel Guaranty, each of defendants agreed that "service of process may be made upon it in any legal proceeding arising out of or in connection with the Loan Documents . . . by service of process as provided by Oklahoma law."

31.     On July 11, 2006, Bond and Bond UK, through Bond, were personally served at the offices of Borrowers in London with the a copy of the complaint and summons, plaintiff's motion to appoint a receiver and brief in support, and the order setting plaintiff's motion for hearing (Dkt. # 11). Additionally, Bond BVI and Akkel were served with these same documents on July 13, 2006 by personal delivery to their registered agent for service. Finally, Bond US was served with these same documents on July 10, 2006 by certified mail to its registered service agent.

32.     On July 28, 2006, defendants filed an unopposed motion requesting additional time to file an answer (Dkt. # 14). In the motion, defendants indicated they were served with the Complaint on July 11, 2006, and requested an additional twenty (20) days to answer or otherwise respond. The Court granted the defendants' request for an extension, giving defendants until August 21, 2006 to answer or otherwise respond to the complaint.

**Nature of the Collateral**

33.     The collateral owned by Borrowers and in which American has a security interest includes approximately 1300 tanks, 250 chassis, and 20 dry containers. Approximately 750 of the tanks, 30 of the chassis, and all 20 of the dry containers are currently leased to customers and are in service on vessels on the high seas, on trucks or railcars in transit, or at storage facilities at or near ports of call in the United States and other countries around the world.

34.     An appraisal prepared by Robert P. Gaudiest of The Daley-Hodkin Group states that the fair market value of certain tanks, containers, box containers, and chassis securing the Loan and identified in the appraisal report is approximately $7,312,250.

35.     The leased and off-hire containers and chassis require physical maintenance, payment of storage charges to avoid storage liens, and relocation from time to time to meet market demands.

The existing and future leases of the containers and chassis require administration of the leases, collection of rents, and on-going contact with lessees. The collateral, insofar as it consists of tools of the business, office furniture and equipment, computers, software, data, files, original records, financial instruments, and bank accounts, is primarily located at Borrowers' office in London.

36. The collateral is of a nature to require the appointment of a receiver to carry out the intent and purpose of the security agreement and Loan Documents, in order that the collateral sought to be foreclosed upon will not be lost, misappropriated, or misused, and so that its value will not be diminished during the pendency of this litigation.

37. Borrowers have been unable to service their business debt. Borrowers were originally scheduled to begin making payments on the Loan on March 31, 2001, with a final maturity date on March 23, 2004. Beginning in October 2004, American encouraged Borrowers to find refinancing of the Loan but Borrowers have been unable to do so. The maturity of the Loan was extended until April 4, 2006. Borrowers have not made payment towards the principal balance of the Loan since May 12, 2004.

38. Borrowers currently have uncollected accounts receivable of about $1,500,000.

39. Borrowers have failed to pay storage charges for many of their tanks, resulting in storage liens on some of the off-hire containers secured to Plaintiff.

40. Borrowers have diverted lease payments to their United Kingdom bank account instead of directing the payments to the lock box as required by the Loan Documents.

41. The Borrowers consented to the appointment of a receiver in the event of a default in the Loan Documents. Specifically, the Security Agreement, § 7, provides that:

> Should a Default occur and be continuing, American may, at its election (but subject to the terms of the Credit Agreement), exercise any and all rights available to a

> secured party under the UCC, in addition to any and all other rights afforded by the Loan Documents, at law, in equity, or otherwise, including, without limitation, . . . (c) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral (and Borrowers and each of them hereby consent to any such appointment) . . .

Dkt. # 2, Ex. E, Security Agreement, at 32.

42.     Bond UK also agreed in its Guarantee and Debenture, § 8, that "[at any time after the security interests created by this Deed have become enforceable, [American] may, without further notice, appoint any one or more qualified persons to be a receiver or receiver and manager of all or any part of the Charged Assets. . . ."

**The Receiver**

43.     Plaintiff has proposed that R. Dobie Langenkamp be appointed receiver over defendants' business interests. Langenkamp testified at the hearing on August 2, 2006 regarding his past experience and the information he has gathered about defendants as a consultant for American.[2] He is an attorney with expertise in the areas of energy law. However, he has been a court-appointed receiver, trustee or special representative charged with managing struggling businesses on several occasions.[3] The bankruptcy court for the Northern District of Oklahoma appointed Langenkamp to investigate possible criminal violations and operate oil wells for SAKET Petroleum Company.[4] He was appointed as receiver for EPIC/Mid-America Cogeneration Steam Plant by the district court of

---

[2]     American originally retained Langenkamp as a consultant on this case, but that relationship will terminate immediately if he is appointed as receiver.

[3]     Langenkamp's resume, as well as his testimony at the evidentiary hearing, provide a thorough list of his qualifications to be appointed as receiver. See Dkt. # 9, Ex. M.

[4]     Although the oil wells were valued at $2 million, the business was eventually sold at a court-approved sale for $25 million.

Oklahoma County.[5] He also has some experience with international businesses, serving as the senior petroleum advisor for the Republic of Kazakhstan and Republic of Georgia. The Court finds that R. Dobie Langenkamp is qualified and should be appointed as a receiver in this case.

## CONCLUSIONS OF LAW

1. The evidence in this case establishes that each defendant has sufficient minimum contacts with the United States and the state of Oklahoma for the Court to exercise in personam jurisdiction over each defendant. Pursuant to the Credit Agreement, § 9.6, each of the Borrowers has agreed and irrevocably consented to the jurisdiction of the Court. Likewise, Bond and Akkel each agreed and irrevocably consented to the jurisdiction of the Court. Contractual forum selection clauses are prima facie valid and enforceable unless they are unreasonable under the circumstances. Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972). In addition, in personam jurisdiction is proper if a nonresident defendant has established sufficient "minimum contacts" with a forum state so as not to offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1940). A nonresident defendant's contacts with a forum state can give rise to jurisdiction over the defendant where (1) the defendant's contacts with the forum are purposeful, and (2) the cause of action arises from or relates to those contacts. Helicopter Nationals de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984). Personal jurisdiction is also present when a nonresident defendant's contacts with a forum state are "continuous and systematic," even if the contacts are not related to the plaintiff's cause of action. Id. at 416. By entering into the Loan and numerous previous loans, and by otherwise transacting business with American in Tulsa, Oklahoma, the

---

[5] As receiver, Langenkamp oversaw operation of the plant's 35 megawatt steam cogeneration plant and negotiated the sale of 120 million cubic feet of natural gas per month.

11

defendants have purposefully, systematically, and continuously invoked the benefits and protections of Oklahoma's laws for over a decade and have additionally agreed to subject themselves to the jurisdiction of the Court. Accordingly, the Court has personal jurisdiction over each defendant.

2. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and in which citizens or subjects of a foreign state are additional parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391 and the agreements of the parties contained in the credit agreement, the Bond Guaranty, and the Akkel Guaranty.

4. Each defendant has agreed in the Loan Documents to "service of process as provided by Oklahoma law." Under Oklahoma law, service of the summons and petition may be made outside of Oklahoma by "personal delivery in the manner prescribed for service within [Oklahoma]" or "in the manner prescribed by the law of the place in which the service is made for service in that place in an action in any of its courts of general jurisdiction." Okla. Stat. tit. 12, § 2004. Under section 2004(C)(1)(c)(3), service of process may be made upon a "foreign corporation . . . by delivering a copy of the summons and of the petition to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process." Under Fed. R. Civ. P. 4, service upon a foreign corporation may be accomplished "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."

5. Each of the Borrowers was properly served with a copy of the complaint and a summons, along with a copy of plaintiff's motion for appointment of a receiver and brief in support, and the

order setting plaintiff's motion for hearing, as evidenced by the returns of service (Dkt. ## 18, 19, 20, 22, and 23) filed by plaintiff.

6. Due process requires that parties whose rights are to be affected by proposed court action have the right to notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 80 (1972); see also Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1178 (5th Cir. 1989) (party against whom preliminary injunction was issued had adequate notice of hearings where it had more than a month from time application for injunctive relief was filed to prepare for hearing); SEC v. Capital Growth Co., S.A., 391 F. Supp. 593, 600-601 (S.D.N.Y. 1974) (foreign defendant had adequate notice of request for preliminary injunction and appointment of a receiver where president of the defendant corporation received notice of the proceedings at least eight days before hearing). Here, defendants were given notice of the scheduled hearing on the appointment of a receiver on July 11, 2006 – over three weeks before the scheduled hearing. Accordingly, defendants had an adequate opportunity to respond to American's request for appointment of a receiver.

7. The parties are in agreement that the "appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993); see also National Partnership Inv. Corp. v. National Housing Development Corp., 153 F.3d 1289, 1291 (11th Cir. 1998); Santibanaz v. Wier McMahon & Co., 105 F.3d 234, 241 (5th Cir. 1997).

8. Appointment of a receiver is appropriate where the parties have contractually agreed to a receivership. The Tenth Circuit has approved the appointment of a receiver based on a security agreement that provided a receiver could be appointed in the event of a default under the agreement.

See Britton v. Green, 325 F.2d 377, 382 (10th Cir. 1963) (holding that mortgagee was entitled to appointment of a receiver where the parties had agreed in mortgage that mortgagee was entitled to appointment of receiver and mortgagor consented to appointment of receiver); see also Fleet Business Credit, L.L.C. v. Wings Restaurants, Inc., 291 B.R. 550, 555-56 (N.D. Okla. 2003) (appointing receiver where mortgage, security agreement, financing statement, and assignment of rents and leases all contained clauses providing for the appointment of a receiver in the event of a foreclosure action). Defendants in this case have expressly consented to the jurisdiction of this Court and have specifically agreed in the security agreement to the appointment of a receiver in the event of a default. Defendants are in default of the Loan Documents. Accordingly, American is entitled to the appointment of a receiver under the bargained-for provisions of the parties' agreements.

9.      In the absence of a contractual agreement for a receiver, a federal court possessing subject matter jurisdiction over an action has the authority to appoint a receiver under appropriate circumstances. See, e.g., Inland Empire Insurance Co. v. Freed, 239 F.2d 289, 293 (10th Cir. 1956) (holding district court had equitable jurisdiction to appoint receiver and that appointment of a federal receiver was necessary and proper under the circumstances); Waag v. Hamm, 10 F. Supp. 2d 1191 (D. Colo. 1998) (federal court has authority to appoint receiver as long as the party seeking appointment of a receiver has a legal or equitable right in the subject property). Factors courts consider in deciding whether to appoint a receiver include: (1) the probability of plaintiff's success in the action and the possibility of irreparable injury to plaintiff's interests in the property; (2) probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim; (3) financial position of the debtor; (4) imminent danger of the property being lost, concealed, injured,

diminished in value, or squandered; (5) inadequacy of available legal remedies; (6) lack of a less drastic equitable remedy; and (7) the likelihood that appointment of a receiver will do more good than harm. Aviation Supply Corp., 999 F.2d at 316-17; Waag, 10 F. Supp. 2d at 1193; see also Fleet Business Credit, 291 B.R. at 556. The evidence indicates that, in addition to the parties' agreement for appointment of a receiver, appointment of a federal receiver is necessary under the circumstances.

10.     As a preliminary matter, federal law requires that "the party seeking receivership must have a legal or equitable substantive right in the property he wishes to seize. . . ." Waag, 10 F. Supp. 2d at 1193. Secured creditors have sufficient interests in the secured property to warrant the appointment of a receiver. See Brill & Harrington Investments v. Vernon Sav. & Loan Ass'n, 787 F. Supp. 250, 253 (D.D.C. 1992) ("Creditors with a security interest in real property have a well-established interest in the property sufficient to support the appointment of a receiver."). American, as a secured interest holder, has a sufficient "legal or equitable substantive right" in the collateral owned by Borrowers to warrant the appointment of a receiver for the collateral. Waag, 10 F. Supp. 2d at 1193.

11.     In order to qualify for injunctive relief before trial, the moving party has the burden to prove four elements to obtain a preliminary injuction: "(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest." Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1254-55 (10th Cir. 2006); see also Country Kids 'N City Slicks,

Inc., v. Sheen, 77 F.3d 1280, 1283 (10th Cir. 1996); Autoskill Inc. v. Nat'l Educ. Support Sys., Inc., 994 F.2d 1476, 1487 (10th Cir. 1993).

12.     The evidence demonstrates that there is a substantial likelihood that American will prevail on the merits of its claims. Defendants defaulted on the Loan and promissory note by failing to pay off the balance of the Loan by April 4, 2006. This also constituted a breach of the credit agreement. Borrowers have released American from any and all claims connected to any of the Loan Documents. Thus, Borrowers have effectively waived and released any defenses to the enforcement of the Loan. Further, the exhibits and testimony received at the hearing, including the affidavits of foreign counsel regarding perfection in the United Kingdom and the British Virgin Islands, establish a prima facie case that American has properly perfected its security interests in the collateral covered by the Loan Documents. Defendants have not disputed that American has properly perfected its security interests in the collateral. Therefore, there is a substantial likelihood that American will succeed on its underlying claims against Borrowers for judgment on the amounts owed under the Loan Documents and for foreclosure of the collateral.

13.     The evidence shows that there is a possibility of irreparable injury to American's interests in the collateral if a receiver is not appointed. The Borrowers' financial position gives no assurance that Borrowers are now able or might soon become able to fully repay the amounts owed on their Loan with American and there is an imminent danger of the collateral or proceeds from the collateral being lost, diminished in value, or squandered during the pendency of this litigation. The Court also finds that the benefits to American from the appointment of a receiver outweigh any potential harm to Borrowers.

14.     The evidence indicates that the collateral is likely inadequate to satisfy the debt owed by Borrowers. The fair market value of the tanks, containers, and chassis secured to American by the Loan has been appraised at $7,312,250. This does not include the value of existing leases as a going concern; however, as of August 2, 2006, the outstanding balance remaining due on the Loan was $23,292,211. Further, default interest continues to accrue daily on the balance due on the Loan at the floating rate defined in the Credit Agreement, § 2.3, on all obligations due under the Loan Documents, including all court costs, reasonable attorneys' fees, and collection costs. Thus, money judgment and foreclosure of the collateral alone is an inadequate remedy to protect American's legal and equitable interests. See, e.g., U.S. ex rel. Zissler v. Regents of the Univ. of Minnesota, 992 F. Supp. 1097, 1112 (D. Minn. 1998).

15.     Balancing other legal and equitable remedies available to American, the appointment of a receiver in this case will best serve the efficient administration of justice and protect the interests of all parties to the collateral. View Crest Garden Apartments, Inc. v. U.S., 281 F.2d 844, 849 (9th Cir. 1960) (A receiver will be appointed when "the most speedy and perfect administration of justice and the rights of the parties interested in the property will be best secured by such action.").

16.     The Court has previously ruled (Dkt. # 36) that any receiver appointed will not be given any authority to use, dispose of, collect payment, or hold any other power associated with the collateral leased to the Havana Club International, S.A. unless American obtains a license from the Office of Foreign Assets Control to conduct business in Cuba. The Court has no authority to grant a receiver powers to conduct business with an entity owned in part by the Cuban government. See Lary v. Republic of Cuba, 643 F. Supp. 194 (S.D.N.Y. 1986); Richardson v. Simon, 420 F. Supp. 916 (E.D.N.Y. 1976).

17.     R. Dobie Langenkamp is well qualified to perform the duties of receiver for the collateral owned by Borrowers, and R. Dobie Langenkamp is not an interested person within the meaning of 28 U.S.C. §§ 458, 957, 958 or Okla. Stat. tit. 12, § 1552, in that he has no financial or other interest in the outcome of this case other than his compensation as receiver.

18.     The Court further recognizes that much of the collateral is located outside the territorial limits of the United States. This Court requests the cooperation of foreign courts in granting recognition and enforcement of the order filed herewith appointing R. Dobie Langenkamp as receiver of the collateral pledged to American in exercising possession and control of such collateral.

19.     Receivers of property in different districts are vested with jurisdiction over the property "upon giving bond as required by the court." 28 U.S.C. § 754; <u>Inland Empire Ins. Co.</u>, 239 F.2d at 292; <u>Continental Bank & Trust Co. v. Apodaca</u>, 239 F.2d 295, 298 (10th Cir. 1956). Whether to require a bond and the amount of the bond rests within the discretion of the court. <u>SEC. v. Universal Fin.</u>, 760 F.2d 1034, 1039 (9th Cir. 1985). Based on the evidence submitted of the current value and condition of the collateral, the Court determines that a bond in the amount of $100,000 is necessary to protect Borrowers' interest in the collateral during the pendency of this litigation. <u>See</u> Fed. R. Civ. P. 65(c).

20.     The Court finds that it is appropriate to enter herewith the Order Appointing Receiver.

**IT IS THEREFORE ORDERED** that American Bank & Trust Co.'s Motion for the Appointment of a Receiver (Dkt. # 8) is **granted**. A separate Order Appointing Receiver is filed herewith.

**DATED** this 17th day of August, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT